## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 19 2018, 9:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jennifer A. Joas
Joas & Stotts
Madison, Indiana

John L. Kellerman II
Kellerman Law Offices
Batesville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Katherine A. Cornelius
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of T.C., Father, and C.A.C., Minor Child,

T.C.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

February 19, 2018

Court of Appeals Case No.
69A01-1708-JT-2010

Appeal from the
Ripley Circuit Court

The Honorable
Ryan J. King, Judge

Trial Court Cause No.
69C01-1701-JT-1

**Kirsch, Judge.**

[1] T.C. ("Father") appeals the juvenile court's order terminating his parental rights to his minor child, C.A.C. ("Child").[1] Father raises one issue on appeal that we restate as: whether the Indiana Department of Child Services ("DCS") presented sufficient evidence that it had a satisfactory plan for Child's care and treatment.

[2] We affirm.

## Facts and Procedural History

[3] Father acknowledges that he has an "extensive DCS history" that expands over the course of twenty years in "different states with different children." *Appellant's Br*. at 6 n.2. As is relevant here, Father and A.C. ("Mother") are the biological parents of Child, born in November 2004. In spring 2015, Child was sent to live with Father and his then-girlfriend ("Girlfriend"). Prior to that time, Child and her younger brother ("Brother"), who was born in 2012, were living with Mother in Kentucky, and near the time that the local child services department was going to remove them from her care, Mother fled with them to Ohio. When Ohio child services became involved, Mother returned to Kentucky with Child and Brother (together, "Children") and left them with a friend. Eventually, the Children came to live with Father and Girlfriend in Indiana.

---

[1] The parental rights of Child's mother were also terminated, but she does not participate in this appeal.

[4] On August 13, 2015, when Child was ten years old, she was removed from Father's home on an emergency basis, after DCS investigated reported child abuse or neglect of three-year-old Brother, who suffered non-accidental injuries while in the care of Girlfriend. Brother was taken to the hospital, where doctors discovered both new and healing broken bones, bruising, and brain injuries from blunt force trauma. Brother later died.[2] DCS filed a verified petition alleging that Child was a child in need of services ("CHINS"). At the time of her removal from Father's care, Child was malnourished and had no spare clothing or belongings to take with her. In a child advocacy interview that took place on August 13, Child stated that she would get one sandwich per day and that she would sometimes cook an egg and share it with Brother. Child was placed in foster care. A week or two later, the foster mother took Child to the hospital due to Child's vomiting, diarrhea, and lack of energy. Child was determined to have a body mass index in the 1.39th percentile for children her age. A nutritionist advised the foster mother, giving her suggestions for supplements and recommendations for nutrition for food intake. She took Child regularly to her primary care physician, and Child gained weight appropriately in the following weeks and months.

[5] The CHINS matter proceeded to a fact-finding hearing in October 2015, and upon the conclusion of the evidence, the juvenile court found that Child was a

---

[2] Girlfriend was convicted of murdering Brother and of neglect of a dependent as to Child, and she is currently serving a sentence of sixty-seven and one-half years.

CHINS. Its findings included: Father could not give a plausible explanation for Brother's injuries; Father had prior neglect and abuse history in Kentucky and Ohio; and he failed to seek medical attention for Child's low weight. In December 2015 and January 2016, the CHINS court entered a dispositional decree and ordered Father to participate in services, including home-based counseling, parenting assessment, psychological evaluation, and to follow all recommendations. At a February 2016 review hearing, DCS presented evidence that Father had not complied with the case plan, had not obtained a psychological evaluation, was not actively engaging in therapy, refused to open up to counselors, and refused treatment for anger management. The court again ordered Father to complete a psychological evaluation.

[6] Father thereafter participated in an evaluation with Dr. Linda McIntire ("Dr. McIntire") in March 2016. Father completed the interview but he was unwilling to talk about certain things, and he would not sign releases for his criminal and medical history. Father had one of the highest scores Dr. McIntire had ever seen on the Child Abuse Potential Inventory, indicating that he was very much at risk for being abusive to a child. Dr. McIntire diagnosed Father with borderline intellectual functioning, and schizotypal personality disorder. Her opinion was that Father's diagnoses made it unlikely that he would be able to effectively and safely parent Child on his own, and "poses a risk even if doing so with assistance." *Pet'r's Ex.* O.

[7] In July 2016, the State charged Father in Ripley County with Level 6 felony neglect of a dependent for failing to seek medical attention for his children. A

no-contact order was issued, and his supervised visitation with Child was discontinued by DCS. In August 2016, the CHINS court changed the permanency plan to guardianship or adoption with a contemporaneous plan of reunification with Mother; Child remained in foster care.[3] *Id.* At an October 2016 review hearing, the CHINS court continued foster placement and found that Father still was not compliant with services. Visitation with Father was suspended because he was charged with neglect of a dependent associated with Brother's death. In February 2017, the CHINS court changed the permanency plan to termination of Father's parental rights and adoption. *State's Ex.* 64. In early 2017, Child was placed with a pre-adoptive foster family.

[8] On January 27, 2017, DCS filed its Verified Petition for Involuntary Termination of Parental Rights. *Appellant's App. Vol. II* at 14-17. At a May 2017 CHINS review hearing, Father still was not participating in services, and the no-contact order with Child was still in effect. Child had been exhibiting acting out behaviors, and a psychological evaluation of Child was ordered at DCS's request. Dr. McIntire conducted an evaluation of Child in May 2017, and she submitted her report to the court in June 2017. On May 24, 2017, Father entered into an open guilty plea to the Level 6 felony neglect of a dependent charge.

---

[3] In or around November 2015, Child changed placement from her first foster home to a second one. *Tr. Vol. II* at 66.

[9] On July 12, 2017, the juvenile court held a fact-finding hearing on the petition to terminate Father's parental rights, and Father appeared in person and by counsel. At the hearing, DCS presented the testimony of, among others, Derdre Moore ("Moore") a social worker with the Carroll County, Kentucky Department of Health and Family Services ("HFS"), an equivalent to Indiana's DCS. Moore testified that HFS began receiving reports of neglect and abuse involving Father beginning in 1995 or 1996 and spanning over twenty years. Moore stated that the parents[4] had a history of filthy and inadequate home conditions, domestic violence, physical abuse, and Father's children exhibited extreme hygiene issues, lack of food, medical neglect, and school truancy. The parents had a history of moving to avoid child services. Moore testified to Father's criminal history, which included a conviction for assault of his seventeen-year-old daughter, who was removed from Father's custody and placed with a relative in Indiana.

[10] Next to testify was Child's first foster mother ("Foster Mother"), who testified that when Child came to live with her in August 2015, Child was "very, very thin" with her clavicle, cheek, and hip bones visible and protruding. *Tr. Vol. II* at 60. Child ate, but could not keep food down at first, and experienced vomiting and diarrhea and was very weak, with no energy to play or do much of anything. Foster Mother took Child for medical treatment, and doctors

---

[4] It appears Father was married to one woman for a period of time, that marriage was dissolved, and he later married Mother.

explained that her inability to eat was due to lack of food. Foster Mother followed nutritional recommendations for Child, and Child gained weight appropriately. Child lived with Foster Mother until around Thanksgiving of 2015, when she was moved to another foster home.

[11] Dr. McIntire, who completed a psychological evaluation of Father and, separately, an evaluation of Child, testified, and her reports were admitted into evidence. Dr. McIntire noted that Father was "moderately cooperative," but refused to sign releases for his criminal and medical history. *Id.* at 104. Dr. McIntire discussed Father's personality disorder, borderline intellectual functioning, and impaired interpersonal functioning, and she opined that it was unlikely that Father would ever be able to safely and effectively parent Child, or any child, on his own and posed a risk even with assistance. *Id.* at 103. His test scores reflected that he was a high risk for perpetrating verbal and physical abuse. *Id.* at 108.

[12] Dr. McIntire recalled that, during her meeting with Child, Child described her past as "horrible[.]" *Id.* at 78. Child expressed having a recurring fear of being abducted by her parents, and she did not want them to know where she was. Dr. McIntire diagnosed Child with, among other things, post-traumatic stress disorder with dissociative features, borderline intellectual functioning, and attention deficit hyperactivity disorder. *Id.* at 98. Dr. McIntire testified that Child's mental and physical health required stability, strong social support, therapy, consistent medication and management, and social skills training. Based on her evaluations of Father and Child, Dr. McIntire opined that Father

was not capable of parenting Child or any child, and it would be psychiatrically, behaviorally, and educationally detrimental and unsafe for Child to be returned to Father's care. *Id*. at 103, 111. Dr. McIntire testified that termination of Father's rights was in Child's best interests. *Id*. at 113. Dr. McIntire did not ask Child where she wanted to live, but Child offered and "was very clear" that she wanted to be adopted and did not want to live with her parents. *Id*. at 79. Dr. McIntire had met with and interviewed the pre-adoptive foster family, with whom Child was living, a few days before she met with Child, and Dr. McIntire testified that the family was capable of providing Child with the care and treatment she needs. She characterized them as being "very invested" in Child's care and well-being, and noting the foster parents' "quality of their insight, their questions, their concern," she believed adoption by them was in Child's best interests. *Id*. at 113.

[13]     Paegan Kersey ("Kersey"), a Relative Care Specialist for DCS, testified to efforts at reunification with Father and services offered. She described that Father was initially compliant, but not "actively engaged" and did not make progress. *Id*. at 138. Eventually, his visitations were suspended because of the neglect charge. He was ordered to complete a psychological evaluation, which he did not do until ordered again to do so. Once Dr. McIntire's evaluation was completed, there was a child and family team meeting to discuss the results. DCS offered to continue with services, but Father stated he did not want to participate. Kersey recommended termination of Father's parental rights and adoption by the pre-adoptive family, with whom Child had been living for

about six months. *Id.* at 157. Child had told Kersey that she wanted to be adopted by the pre-adoptive foster family, and Kersey noted that Child "already refers to them as mom and dad[.]" *Id.* at 156.

[14] Counsel for Father asked Kersey about DCS's efforts to find relative placement for Child. Kersey stated that DCS had received "an approved ICPC from Georgia" for Father's mother, Ivalee Brown ("Grandmother"), but noted that, after talking to Child and other family members, "there were concerns on our end" about placement with Grandmother, including and not limited to Grandmother's health condition. *Id.* at 159-61, 163, 172. Because of those concerns combined with Child's desires, DCS decided that Grandmother's home was not an appropriate placement for Child. *Id.* Child had expressed fear to Kersey that Grandmother would "give her back" to Father. *Id.* at 164.

[15] CASA Sandra Wakefield ("CASA Wakefield") also testified. She began as CASA for Child in August 2015. At an August 2016 DCS team family meeting, Father told CASA Wakefield that he no longer wished to participate in services, and he did not do so. CASA Wakefield testified to having met with all of the foster placements since removal, and, as to the pre-adoptive family, she said there was a strong bond between the family and Child, offering that Child "loves those people" and "wants to stay there and . . . be their daughter." *Id.* at 178. CASA Wakefield testified that it was in Child's best interests for Father's parental rights to be terminated and that she be adopted by the current family. *Id.* at 178, 180. CASA Wakefield also testified, "[Child] has told me,

without me even asking, that she does not want to live with her [G]randmother or any of her family members." *Id*. at 180.

[16] Following the conclusion of DCS's evidence, Father's counsel called two witnesses, Father and Grandmother. Father acknowledged that Child should not be returned to his care at the present time, stating that he believed he would soon be going to prison for the neglect of a dependent conviction. Father testified that his desire was that his mother, Grandmother, raise Child in Georgia. Grandmother, who was sixty-four years old at the time, testified that she wanted Child to come and live with her. During her testimony, she was asked about a 2014 visit she made to see Child and her Brother when they were living with Mother in Ohio. At that time, neighbors told Grandmother that the Children were sleeping "in all different places," including the doghouse. *Id*. at 200. She also recalled that both Children were extremely thin, and she suspected they were being abused, but she did not report the suspected abuse or neglect.

[17] On July 31, 2017, the juvenile court issued its Order on Involuntary Termination of Parental Rights ("Order") terminating Father's parental rights to Child. The Order's findings noted that Grandmother had three children, including Father and his sister, whose parental rights to her children were terminated, and Father's oldest daughter was removed from his care in Kentucky and then his son was murdered by his Girlfriend. The court continued:

It is this history, [Child]'s fear of being placed with [Grandmother] and [Child's] desire to be adopted by [adoptive family], the inconsistency of contact between [Child] and [Grandmother] and [Child]'s close and stable relationship with the [adoptive family] that DCS cited as reasons for denying [Grandmother]'s request for placement of [Child]. Although the Department need not prove that adoption of [Child] by the [adoptive family] is anything more than a "satisfactory plan," the Court finds that said adoption by the [adoptive family] is in [Child]'s best interests, especially when compared to being sent to live with [Grandmother].

*Appellant's App. Vol. II* at 38. The Order also noted that Child submitted a Youth Report to the juvenile court, expressing her desire to be adopted by the identified adoptive family. CASA Wakefield testified to contacting Child after the report to ensure it was true, accurate and uncoerced. The juvenile court stated, "[Child]'s wishes, while not controlling, should be a factor for the Court's consideration in determining the best interests of the child." *Id.*

[18] The Order concluded, in relevant part, that termination was in the best interests of Child and:

That there is a satisfactory plan for the care and treatment of the child. Specifically, that [Child] will be adopted by her pre-adoptive foster parents. With respect to this issue, the Court would note that [Father] argued that TPR should be denied because the plan should have been for his mother to adopt [Child] because she is a blood relative. This is not the state of the law. Case law is clear that relatives have no preferential legal right to adopt. The controlling factor is the best interests of the child.

*Id.* at 39.  The juvenile court terminated Father's parental rights, and he now appeals.

## Discussion and Decision

[19] As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make.  They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]"  *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent.  *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.*  That is, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship.  *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied.*

[20] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses.  *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009).  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  Moreover, in deference to the trial court's unique position to assess the evidence, we will

set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[21] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[22] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[23] Here, Father does not challenge the determinations that the conditions that resulted in the Child being removed or the reasons for Child's placement outside the home would not be remedied or that the continuation of the parent-child relationship posed a threat to her well-being. Rather, he asserts that DCS failed to prove "that adoption by pre-adoptive placement was a satisfactory plan in [Child]'s best interests." *Appellant's Br.* at 13.

### *Satisfactory Plan*

[24] Initially, we observe that Father's argument appears to conflate two separate statutory requirements: (1) that termination be in the child's best interests and (2) that DCS has a satisfactory plan for the child in question. Ind. Code § 31-35-2-4(b)(2)(C), (D). That is, there is no requirement that DCS's plan be in the

child's best interests.[5]  Rather, Indiana courts have held that for a plan to be "satisfactory," for purposes of the statute, it "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *Lang*, 861 N.E.2d at 374.  A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. *Id.*  In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *In re A.S.,* 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*.

[25]  The basis of Father's position on appeal is that "[t]here was a fit and willing relative" – namely Grandmother – "who was approved for placement well before the termination hearing[,]" and placement with her, "would have alleviated the need for parental termination." *Id*.  Father advises that he "is aware of the current status of the law[,]" under which the juvenile court was not required to place Child with Grandmother, and relatives do not possess a preferential legal right to adopt. *Appellant's Br*. at 17.  However, he challenges it under the facts of this case, arguing that Child should have been placed with Grandmother, especially given the fact that she was both approved[6] and

---

[5] The juvenile court's Order noted the same when it stated, "Although the Department need not prove that adoption of [Child] by the [adoptive family] is anything more than a "satisfactory plan," the Court finds that said adoption by the [adoptive family] is in [Child]'s best interests, especially when compared to being sent to live with [Grandmother]." *Appellant's App. Vol. II* at 38.

[6] Father notes that "the ICPC" evaluation of Grandmother's residence in Georgia was completed and approved in March 2017. *Appellant's Br*. at 17.  This is a reference to Indiana's Interstate Compact on the Placement of Children, Indiana Code Chapter 31-28-4, a statutory scheme that facilitates the interstate placement of children and resolves jurisdictional issues.

available during the CHINS proceedings. We find no error with the trial court's decision to terminate Father's rights and not place Child with Grandmother.

[26] Father urges that "[Child] had a relationship with paternal [G]randmother," suggesting a close relationship, but the evidence was that, for the preceding five years or so, Grandmother generally saw Child once per year for about five days each. *Appellant's Br.* at 18; *Tr. Vol. II* at 204. When Grandmother saw Child in 2014 in Ohio, while Child and Brother were living with Mother, Grandmother noticed that Child was very thin and suspected child abuse, but did nothing about it. Neighbors told Grandmother that Children were sleeping in the doghouse while Mother slept in the car, and Grandmother did nothing about it. Evidence was presented that Child did not want to be with Grandmother or any other relative, and, in fact, did not want her family to know where she was living. She expressed concern that, if she was placed with Grandmother, that eventually she would be returned to her parents' care. She avoided using social media because she did not want family, including Father, to find her. Child had recurring fears that her parents would locate and abduct her. Child submitted a Youth Report to the juvenile court, expressing her desire to be adopted by the pre-adoptive family with whom she was placed, and CASA Wakefield thereafter spoke with Child to verify that her report was true, accurate, and uncoerced. Dr. McIntire met with the pre-adoptive foster parents for an interview, and she believed adoption by them was in Child's best interests.

The juvenile court heard and considered Father's evidence and argument regarding placing Child with Grandmother, as well as DCS's evidence concerning Child's needs, desires, and recommended placement, and it determined that adoption was not only a satisfactory plan, as is required by statute, but was "in [Child]'s best interests, especially when compared to being sent to live with [Grandmother]." *Appellant's App. Vol. II* at 38. We find no error with the juvenile court's decision.

### Best Interests

To the extent that Father also claims DCS failed to prove that termination of his parental rights was in Child's best interests, we reject his claim. First, other than arguing the position that Grandmother would have been a better placement, Father did not present separate argument or support for the position that termination was not in Child's best interests, and his claim is waived. Ind. Appellate Rule 46(A)(8). Second, waiver aside, the record supports the juvenile court's determination that termination was in Child's best interests. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*), *trans. dismissed*. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before

terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)). Testimony of the service providers, such as recommendations of the case manager and guardian ad litem, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.*, 17 N.E.3d at 1005.

[29] Here, it is without dispute that Child has suffered numerous traumas in her lifetime, resulting in needed and ongoing support and therapy. Dr. McIntire testified to Child's PTSD, the recurring fears Child experienced about possibly be abducted by either of her parents, and the need for someone other than family to adopt her. Dr. McIntire testified that Father was not able, and likely never was going to be able, to adequately and safely care for Child even with assistance. Kersey and CASA Wakefield testified that termination of Father's rights was in Child's best interests, and they recommended adoption. DCS presented clear and convincing evidence that termination of Father's parental rights was in Child's best interests.

[30] We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of

Father's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[31]   Affirmed.

[32]   Bailey, J., and Pyle, J., concur.